UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| ART STAR, | : | Bankruptcy No. 07-13440DWS |
| aka ARKADY V. BULGAKOU, | : | |
| | : | |
| Debtor. | : | |

# MEMORANDUM OPINION

**BY:  DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the Court is the Chapter 13 Trustee's (the "Trustee") Motion to Dismiss this bankruptcy case (the "Trustee's Motion") on the grounds that Debtor's noncontingent, liquidated, unsecured debts exceed the statutory limit established by 11 U.S.C. § 109(e). Also pending is the Motion to Convert Case to Chapter 7 (the "Conversion Motion"), filed by one of Debtor's unsecured creditors, Eugene Solyarik ("Solyarik"). For the reasons that follow, the Trustee's Motion is granted. Accordingly, the Conversion Motion is moot.

**FACTUAL AND PROCEDURAL BACKGROUND**

Debtor filed this Chapter 13 case on June 14, 2007. On June 29, 2007, he filed his Schedule F,[1] which disclosed unsecured nonpriority claims totaling $478,566.30. None of

---

[1] I shall take judicial notice of the docket entries in this case. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); Levine v. Egidi, 1993 WL 69146, at *2 (N.D. Ill. 1993);

these claims were marked as "disputed," "unliquidated," or "contingent," as the form allows. Schedule F included a claim of $200,000.00 by the Great Atlantic & Pacific Tea Co. ("A&P") and a claim of $90,701.22 by Solyarik. The petition and schedules were filed by Debtor's former counsel, Tova Weiss, Esquire.

The Trustee's Motion was filed on October 15, 2007, seeking dismissal because Debtor's liquidated, noncontingent unsecured claims exceeded the threshold limit of § 109(e). Debtor's current counsel, David A. Scholl, Esquire, entered his appearance on October 23 and two days later filed an Amended Schedule F on behalf of Debtor. The only material change made by the Amended Schedule F is with respect to the claims by A&P and Solyarik.[2] The amendment increased the A&P and Solyarik claim amounts to $270,282.16 and $131,413.41, respectively, consistent with the proofs of claim filed by those creditors. More significantly, the Amended Schedule F re-characterized the A&P claim as disputed, unliquidated and contingent and the Solyarik claim as disputed and unliquidated.

On November 5, 2007, Solyarik filed the Conversion Motion, alleging that Debtor was ineligible for Chapter 13 relief under § 109(e) and may have concealed his ownership interest in certain real estate. A consolidated hearing on the Trustee's Motion and the Conversion Motion was held on December 10, 2007. Debtor, whose primary language is Russian,

---

In re Paolino, 1991 WL 284107, at *12 n. 19 (Bankr. E.D. Pa. 1991); see generally In re Indian Palms Associates, Ltd., 61 F.3d 197 (3d Cir. 1995). Although the First Schedule F is erroneously titled "*Amended* Schedule F," I take judicial notice that it was in fact an initially filed schedule.

[2] The only other change made in the Amended Schedule F is the deletion of a credit card claim by Chase Bank of approximately $12,000. No testimony was provided as to this change, but the original Schedule F has two Chase claims under the same account number, implying that the amendment may have been to eliminate an erroneous duplicate claim.

-2-

testified with the assistance of an interpreter. Solyarik was present and testified as to his claim. At the end of the hearing, it was agreed that disposition of the Conversion Motion would await a determination of the eligibility question.[3] If the issue is decided in favor of the Trustee, Solyarik concedes to dismissal and will not pursue conversion.[4] Of relevance to the Trustee's Motion, the following facts were elicited at the hearing.

Debtor owns a one-third interest in Kleopatra, Inc. ("Kleopatra"), a now defunct corporation that operated a restaurant at 15005 Bustleton Ave., Philadelphia, PA. Kleopatra rented the Bustleton Ave. space from A&P pursuant to a five-year lease entered into on or about December 29, 2000 (the "Bustleton Lease"). Debtor acknowledges that he signed a guaranty of Kleopatra's lease obligations. (the "Guaranty").[5]

On or about May 22, 2003, A&P filed a complaint against Kleopatra and Debtor in the Court of Common Pleas, Philadelphia, PA for breach of the Bustleton Lease (the "State Action").[6] The complaint in the State Action alleges that Kleopatra is in default of the

---

[3] The parties agreed that the Conversion Motion necessitated transcription of the meeting of creditors held pursuant to § 341 whereas the Trustee's Motion could be decided based upon the record made that day.

[4] A&P did not appear at the hearing. While it filed a statement urging conversion to Chapter 7 rather than dismissal, A&P did not file its own conversion motion. Given the outcome and Solyarik's resulting abandonment of his request to convert, there is no pending conversion request for A&P to support.

[5] A lease and guaranty are attached as exhibits to A&P's Proof of Claim.

[6] A copy of the State Action complaint is attached to A&P's proof of claim. I also take judicial notice of the public docket report for the State Action. Judicial notice of public filings is appropriate under Federal Rule of Evidence 201(b)(2). See Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000).

Bustleton Lease for nonpayment of rent and seeks outstanding rent and ejectment of Kleopatra from the premises. It asserts liability against Debtor under the Guaranty.

Before the State Action went to trial, Kleopatra filed a Chapter 11 petition in this Court on May 27, 2004, In re Kleopatra, Inc., No. 04-17408. On May 2, 2005, the Kleopatra Chapter 11 bankruptcy was converted to a case under Chapter 7 on the motion of the United States Trustee. This is consistent with the Debtor's testimony that Kleopatra "shut down" sometime in 2005. The Kleopatra Chapter 7 case was fully administered and closed on May 16, 2007, with A&P receiving only a distribution for an administrative claim of $2,449.78.[7]

Debtor testified that he "left," Kleopatra sometime in 2004, before Kleopatra filed its bankruptcy case, i.e., before May 27, 2004.[8] At that time, he stated that rent had not been paid on the Bustleton premises for a year. Debtor further testified that the annual rent at that time was approximately $65,000.[9] Debtor also testified that he believed that Kleopatra owed A&P $80,000, based on a rental obligation of $120,000 minus a deposit of $40,000.

---

[7] See Case No. 04-17408, Completion Report and Zero Bank Statement, Trustee's Certification of Completion of Administration. Doc. No. 109.

[8] Though no further explanation was provided, and given that he still has an ownership interest in the corporation, presumably he means that he was not actively involved in the operation of the Kleopatra restaurant since then. His answer is consistent with his Answer to a complaint in an adversary filed in the Kleopatra case, Kleopatra, Inc. v. Art Star, et. al., Adv. No. 04-0657, in which he asserts that he was assaulted and forced out of the restaurant in late January 2004 by the corporation's co-owner, Walter Shagabaev, and did not return for fear of his personal safety. Complaint and Answer ¶ 22. The adversary proceeding was abandoned by the Chapter 7 Trustee after conversion from Chapter 11 and subsequently dismissed for lack of prosecution.

[9] His estimate is reasonably close to the $68,818.08 amount found in paragraph 3 of the lease that is attached to A&P's proof of claim.

However, his later testimony clarified that the $120,000 was based upon a settlement offer so it is likely that $120,000 is a compromise number of a higher rental obligation.[10]

With respect to his debt to Solyarik, Debtor concedes that he and Solyarik entered into a written agreement on September 14, 2006 whereby Debtor transferred several of his outstanding credit card balances to credit cards in Solyarik's name which had lower or temporary promotional interest rates (the "CCA").[11] Exh. M-5. Pursuant to the CCA, Debtor was to make the minimum monthly payment on the balance transferred to Solyarik's credit cards during the promotional periods, after which the balances would be transferred back to Debtor's cards. In consideration for using Solyarik's credit lines, Debtor agreed to pay Solyarik a fee of one percent of the balance each month. Debtor does not dispute that Exhibit M-5 is the agreement governing his debt to Solyarik.

I did not find Debtor's testimony credible with respect to how much he owes Solyarik. He testified that he transferred "probably in the vicinity of $120,000" to Solyarik's credit card accounts. The CCA signed by Debtor, indicates, with detailed supporting exhibits itemizing ten transactions, transfers aggregating $140,500. Debtor testified to his belief that he owed approximately $90,000, estimating that he "probably" made monthly payments of $3,000 for about fourteen months, or paid "about $30,000." Again, Debtor's testimony

---

[10] His testimony was unclear whether this offer was made by Kleopatra or by A&P or even when this offer was made. There is no evidence that the settlement was ever accepted.

[11] Debtor's relationship with Solyarik arises from the fact that Solyarik at one time worked at a restaurant named XO, which Debtor is affiliated with in some way. The relationship was never fully explained. Solyarik testified that Debtor no longer owns XO "on paper" but still gets money from it. Debtor testified he works at XO and is paid a salary. Debtor's Amended Schedule F indicates he is a Manager of Kleopatra Flowers, Inc.

appeared to be more of a guess than any clear recollection, nor did Debtor proffer any documentary evidence of payments. I note that fourteen months of payments does not comport with Debtor's later testimony that he stopped making payments when he filed for bankruptcy on June 14, 2007, which was nine months following the execution of the CCA. Nor was it clear from his testimony whether his estimate of payments included the fee he was paying to Solyarik, which would not reduce the amount owed on the transferred accounts.[12]

Solyarik testified that the amount transferred from Debtor's credit cards to his was $140,000, which is supported by the CCA. Exhibit M-5. I find Solyarik's testimony that the current outstanding balance is in the range of $131,000 to be more credible and realistic than Debtor's estimate. Only nine months passed between the date of the CCA and Debtor's bankruptcy case during which Debtor was only paying approximately $1,600 to reduce the principal balance of his debt. Thus, his $3,000 monthly payments could have only reduced the debt by $14,400.[13] Furthermore, two of Solyarik's cards were not zero percent cards[14] so interest was running on the amount transferred. Finally, the promotional rate on all of Solyarik's cards expired on various dates between December 2006 and July 2007. Thus, the $3,000 monthly payments that Debtor did make went to interest on the cards as well as the fee to Solyarik required by the CCA and not solely to reduce the principal amount transferred.

---

[12] This is not an insignificant amount given his large balance of $140,000 (1% = $1,400).

[13] $3,000 payment less $1,400 fee = $1,600 principal reduction x 9 payments.

[14] Debtor transferred $19,800 to a Solyarik card at a rate of 3.99% "for-life" and $11,850 to a card charging 1.99% until March 2007.

-6-

**DISCUSSION**

<u>A.</u>

An individual qualifies for Chapter 13 relief only if his or her debts do not exceed a certain sum at the time of filing: "Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $336,900. . . may be a debtor under chapter 13." 11 U.S.C. § 109(e). Debtor's Amended Schedule F lists unsecured, debts totaling $577,120.65. Of these, Debtor has marked the Solyarik debt as "unliquidated" and "disputed" and the A&P debt as "contingent," "unliquidated," and "disputed." If these two debts are excluded, Debtor's unsecured debts total only $175,425.08, an amount clearly below the eligibility ceiling.[15]

A debt is liquidated when "the process for determining the claim is fixed, certain, or otherwise determined by a specific standard." <u>Barcal v. Laughlin (In re Barcal)</u>, 213 B.R. 1008, 1014 (8th Cir. BAP 1997). <u>See also</u> <u>In re Slack</u>, 187 F.3d 1070, 1073 (9th Cir. 1999) (question of whether a debt is liquidated "turns on whether it is subject to 'ready determination and precision in computation of the amount due.'" (citations omitted)). The amount is readily and precisely determinable, where it is determinable by reference to

---

[15] As Debtor notes, "the determinative issue becomes whether the[y] are properly characterized as '"unliquidated."'" Debtor's Mem. at 3. Debtor's memorandum is silent as to his basis for contending the A&P debt is contingent so it is unclear whether he is maintaining his position as stated on Amended Schedule F. Nevertheless, I will address both requirements.

-7-

an agreement[16] or by simple computation. U.S. v. May, 211 B.R. 991, 996 (M.D. Fla. 1997) (*citing* Collier on Bankruptcy, 15th Ed. at 1109.06[2][c] (March 1997)).

Debtor argues that the Court should simply accept his characterization of the A&P and Solyarik debts on his Amended Schedule F. In support, he relies on Comprehensive Accounting Corp. v. Pearson (In re Pearson), 773 F.2d 751 (6th Cir.1985), where the court stated that "Chapter 13 eligibility should normally be determined by the debtor's schedules checking only to see if the schedules were made in good faith." Id. at 757. Debtor further argues that this proposition has been followed by the Courts of Appeals for the Ninth and Tenth Circuits. See In re Scovis, 249 F.3d 975, (9th Cir. 2001); In re Young, 237 F.3d 1168, 1171 n.1 (10th Cir. 2001). Presumably as he has listed these debts as disputed and unliquidated on his Amended Schedules, he believes no value should be attributed to them. I respectfully disagree.[17]

First, it is generally accepted that the debtor's disputing a debt does not affect whether it is liquidated. If the amount of claim can be determined, then the debt is liquidated even though debtor may dispute liability or amount. E.g., In re Mazzeo, 131 F.3d 295, 303-04

---

[16] Indeed, because the terms of a contract typically define the obligations and damages for noncompliance, "contract debts (even though disputed) are considered liquidated, and tort claims are not." Matter of Vaughan, 36 B.R. 935, 938 (N.D. Ala. 1984).

[17] When the same argument was advanced in Vaughan, the Court responded:

Debtor attempts in his brief to intertwine and to equate the term "disputed" and the term "liquidated." His attempt is understandable. However, the terms are separate and distinct.

36 B.R. at 938.

(2d Cir. 1997); United States v. Verdunn, 89 F.3d 799, 802 (11th Cir.1996); In re Knight, 55 F.3d 231, 235 (7th Cir.1995); In re Barcal, 213 B.R. at 1013-14; In re Pennypacker, 115 B.R. 504, 505-06 (Bankr. E.D. Pa. 1990).[18] Thus, the Debtor's Amended Schedules that list the A&P and Solyarik claims in the amounts asserted in those creditors' proofs of claim but as disputed do not end my inquiry as Debtor suggests. Rather the Court may examine other sources than the Debtor's Schedules to determine whether the claim is liquidated. I am neither bound by nor persuaded that Pearson prescribes the correct inquiry for determining whether these debts are unliquidated.

While the Third Circuit Court of Appeals has not spoken on this issue, I note that numerous courts, in addition to our own, have expressly rejected Pearson's holding to the extent that it finds that a debtor's characterization of the debt as not liquidated is controlling. E.g., Lucoski v. I.R.S. (In re Lucoski), 126 B.R. 332, 343-42 (S.D. Ind. 1991) ("The Court should not be limited to the debtor's characterization of the debts for the eligibility determination. The restrictions were placed in § 109(e) so that only certain debtors would qualify for Chapter 13 relief, and this Court rules that the debtor should not be allowed to

---

[18] The Pennypacker court noted that the debtor urged it to adopt the minority view as represented by Pearson and two early bankruptcy cases that disputed debts, contractual or otherwise, are unliquidated. In refusing to do so, it reasoned:

> We reject these approaches because we find that to the extent that they require total reliance by the court upon the debtor's characterization of the debts in his schedules, we do not believe that the debtor should be given unbridled authority to determine his eligibility for chapter 13 relief. This is particularly significant in light of the broad scope of the chapter 13 discharge.

Id. at 506. Pennypacker has been quoted with approval by our district court in In re Heaton, 2001 WL 1175099, at *2 & n.5 (E.D. Pa. Sept. 28, 2001).

circumvent these restrictions"); In re Salazar, 348 B.R. 559, 564 (Bankr. D. Colo. 2006) ("The requirement that a debt must be liquidated to apply towards the eligibility requirements suggests that the Court may not rely solely upon the Debtors' schedules"); In re Steffens, 342 B.R. 851, 852 (Bankr. M.D. Fla. 2005) ("[T]he decision in U.S. v. Verdunn, 89 F.3d 799 (11th Cir. 1996) implies that courts may look outside the schedules in determining eligibility"); In re Arcella-Coffman, 318 B.R. 463, 474-75 (Bankr. N.D. Ind. 2004) ("The Seventh Circuit has very clearly modified the Pearson procedure: materials outside the schedules may be taken into account in the § 109(e) determination. Moreover, as observed by Steffens and Arcella-Coffman, the Eleventh and Seventh Circuits, without discussing Pearson or Scovis, looked outside a debtor's schedules to determine whether debts were liquidated for eligibility purposes. Verdunn, 89 F.3d at 803 (amount of tax liability evident from the statutory notice of deficiency and ascertainable by computation using fixed legal standards set forth in the tax code); Knight, 55 F.3d at 235 (claim was fixed in state's demand letter and amount easily calculable by multiplying the number of violations times the statutory fee). The Second Circuit is in accord. Mazzeo, 131 F.3d at 305 (officer's debt can be easily ascertained from statutory provisions and from tax returns filed by corporation).

Debtor also claims the A&P and Solyarik claims are noncontingent although not explaining his rationale for so stating. To the extent he reasons that they are to be characterized as such because they are reported on his Amended Schedules in this manner, he misperceives the Pearson line of cases, none of which came to this conclusion. Pearson

-10-

does not hold that the debtor's schedules should be relied upon in making a determination with respect to the contingent nature of debt. Rather it and the cases that follow it address the principal (and perhaps only) issue framed by Debtor, i.e., whether the debts are liquidated in amount.[19] A debt is noncontingent if all events giving rise to liability occurred prepetition. Only if liability relies on some future extrinsic event which may never occur will the debt be held to be contingent. E.g., Mazzeo, 131 F.3d at 303; In re McGarry, 230 B.R. 272, 275 (Bankr. W.D. Pa. 1999). It is clear that this determination requires an examination of more than a debtor's schedules.

To determine whether the liquidated and noncontingent debts are within the eligibility ceiling, the approach taken by the 8th Circuit Bankruptcy Appellate Panel in Barcal, supra, appears to strike the right balance:

> Rather than making final determinations on disputed liabilities, it is appropriate for a court considering eligibility to rely primarily upon a debtor's schedules and proofs of claim, checking only to see if these documents were filed in good faith. In so doing, however, the court should neither place total reliance upon a debtor's characterization of a debt nor rely unquestionably on a creditor's proof of claim, for to do so would place eligibility in control of either the debtor or the creditor. At a hearing on eligibility, the court should thus, canvass and review the debtor's schedules and proofs of claim, as well as other evidence offered by a debtor or the creditor to decide only whether the good faith, facial amount of the debtor's liquidated and non-contingent debts exceed statutory limits.

---

[19] The Pearson court was addressing the use of schedules to ascertain the amount of debt to meet eligibility, not the nature of the debt. Similarly, the Ninth Circuit Court of Appeals in Scovis was concerned with determining the amount of debt at the time of the petition as opposed to a changed amount based upon later events. Young gives Pearson a passing footnote reference with respect to an issue it notes was not raised on appeal, simply quoting the case to say that "section 109(e) considers debts as existing at filing, not at the time of a hearing."

213 B.R. at 1015 (citations omitted).  In a simple hearing of this nature, the Court will be able to determine whether a claim is capable of "ready determination" and "precision in computation of amount" necessary to qualify as a liquidated debt and whether the events giving rise to liability occurred prepetition.  Arcella-Coffman, 318 B.R. at 472-73.

B.

The Trustee bears the burden of going forward with evidence that Debtor is not eligible.  See In re Horne, 277 B.R. 320, 322 (Bankr. E.D. Tex.2002) ("Movant bears the burden of proof to demonstrate to the Court, by a preponderance of the evidence, that the Debtor does not comply with the § 109 debt limit.").  I find that the Trustee has met that burden for the reasons that follow.

The Trustee has submitted the claims register that evidences the filing of proofs of claim by A&P and Solyarik in the amounts of $270,282.16 and $131,413.41 respectively.  Exhibit T-1.  The Debtor's Schedules, filed at the inception of the case, list A&P and Solyarik with undisputed claims of $200,000 and $90,000 respectively.  Neither claim is marked contingent or unliquidated.  These same Schedules show total unsecured claims of $478,566.30, clearly beyond the eligibility threshold.  While Pearson might suggest that the schedules filed at the commencement of the case, not the amended ones, control the eligibility determination, the better view is that the amendment of Schedule F to re-characterize the A&P and Solyarik debts as unliquidated and contingent only after the Trustee's Motion was filed lessens the deference the Schedules are to be accorded by the

-12-

Court. Amending schedules in response to a challenge to § 109(e) eligibility is itself a basis for looking beyond the schedules. In re Spurlin, 350 B.R. 716, 719 (Bankr. W.D. La. 2006) (the fact that the debt is listed on personal bankruptcy schedules as "non-contingent, liquidated and undisputed" up and until the point when the motion to convert the case was filed certainly suggests that close scrutiny of that amendment is warranted); Arcella-Coffman 318 B.R. at 476 ("Amendments made on the eve of trial, or close in time after the initiation of a matter or proceeding in which the debtor would be disadvantaged by the schedules in their pre-amendment form--raise very concrete evidentiary issues as to the qualitative worth–'weight' if you will--to be given to the amendments").[20] Debtor's amendment to Schedule F, literally on the heels of the Trustee's Motion, placed the burden on him to explain the basis for his amendment. After the hearing, that question remained wholly unanswered. For that reason, I give little credence to his characterization of the nature of the debts at issue here, a conclusion I believe that would obtain under Pearson and its progeny. Rather I have allowed the parties to present testimony and documentary support for their positions, and I take judicial notice of the proofs of claim filed in this case.

As the Trustee points out, and as Debtor concedes, the A&P debt is governed by written agreements, i.e., the Bustleton Lease and Guaranty. Written leases, particularly commercial leases, typically include detailed provisions defining the amount of monthly rent as well as penalties and late fees associated with default. There is no contention that

---

[20] Like the debtor in Spurlin, the debtor in Arcella-Coffman scheduled debts as "liquidated" and "noncontingent" on three amended schedules until her Chapter 13 eligibility was questioned. Only then did the debtor redesignated certain debts as "unliquidated."

-13-

the Bustleton Lease is an exception, a fact confirmed by examination of the attachment to A&P's proof of claim. While the amount of the debt is disputed, the Bustleton Lease allows the amount to calculated with precision, and Debtor acknowledges signing the Guaranty, which renders him responsible for Kleopatra's debt. Finding the A&P debt to be readily determinable by reference to the Bustleton Lease and Guaranty, it is "liquidated" for purposes of § 109(e). See May, Vaughn, Pennypacker, supra. Moreover, I need not struggle with the amount of the debt to include in the eligibility determination. Debtor has argued for the application of In re Hustwaite, 136 B.R. 853, 855 (Bankr. D. Or. 1991), which holds that "to the extent liability is admitted, the claim is liquidated at least in that amount." 136 B.R. at 855. While Hustwaite and the other cases cited by Debtor are distinguishable,[21] if I apply this rule, I find that Debtor has admitted a liquidated debt of $80,000.

Similarly, the debt owed to Solyarik is governed by a written contract, the CCA. Exhibit M-5. Despite Debtor's characterization of this as a "complicated transaction," Debtor's Mem. at 3, the amount of Solyarik debt can be readily ascertained. The CCA

---

[21] Debtor relies on Hustwaite (damages from tort claim of sexual abuse were unliquidated); In re Bush, 120 B.R. 403, 406 (Bankr. E.D. Tex. 1990) (debtor's guilty plea of embezzlement of in excess of $100,000 did not suffice to liquidate that claim); and In re Belt, 106 B.R. 553, 558-59 (Bankr. N.D. Ind. 1989) (debtor's admission of criminal liability for a DUI in excess of $100,000 did not liquidate a debt in that amount). Debtor's Mem. at 3. These cases involving tort damage are inapposite to the facts before me, i.e., debts that can be determined by examination of a written contract and mathematical computation. See U.S. v. May; Matter of Vaughn, supra. Moreover, Hustwaite's holding was based upon the debtor's denial of all allegations of fact supporting the claim, i.e., a finding that there was a defense as to liability. 136 B.R. at 855. The majority of decisions view liability to be a separate issue from whether a debt is capable of ready computation. See In re Dow Corning Corp., 215 B.R. 346, 356 n.8 (Bankr. E.D. Mich. 1997) (citing Wenberg v. FDIC (In re Wenberg), 902 F.2d 768 (9th Cir. 1990).) The Debtor has acknowledged liability in this case.

clearly identifies the amount of the funds transferred, including detailed supporting exhibits identifying the name and account number of the credit cards along with balances and interest rates Debtor had been paying and those he would be paying, the fees to be charged for the use of Solyarik's credit and the obligation to make minimum monthly payments. I take "judicial notice that the terms of an agreement between a credit card holder and a credit card issuer are set forth in writing." In re Kendall, 380 B.R. 37, 45 (Bankr. N.D. Okla. 2007). Along with the CCA, the agreements governing those cards will identify relevant information for determining the amount of the Solyarik debt, such as interest rates, late fees, and penalties which will increase the principal amount of the funds transferred. Moreover, there will be statements from the card issuers documenting payments made and application of interest and other fees relevant to the balance transfers. Thus, it is clear that the Solyarik debt can be determined with pin-point precision and is therefore "liquidated" for purposes of § 109(e). As noted above, see pp. 5-7 supra, I have determined that the liquidated Solyarik debt for the purpose of the eligibility determination is as stated in his proof of claim, $131,000 based on the evidence elicited at the hearing.

With respect to the A&P debt which Debtor has scheduled as contingent, it will be "contingent" for § 109(e) purposes only if liability is dependent upon a future event. E.g. In re Mazzeo, 131 F.3d 295, 303 (2nd Cir. 1997); In re McGarry, 230 B.R. 272, 275 (Bankr. W.D. Pa. 1999). Debtor's liability stems from the Guaranty. Generally "[t]he classic example of a contingent debt is a guaranty because the guarantor has no liability unless and until the principal defaults." Pennypacker, 115 B.R. at 507. However, Debtor concedes that

Kleopatra had not paid rent for over a year before he left in early 2004. Nonpayment of rent is the quintessential default of a lease.[22] Thus, according to Debtor's own testimony, the triggering event for liability under the Guaranty occurred no later than early 2003, well before the commencement of his bankruptcy case. The scheduled debt to A&P is noncontingent.[23]

Giving Debtor every benefit of the doubt with regard to the disputed amounts of the A&P and Solyarik proofs of claim, his testimony supports my finding liquidated and noncontingent claims of at least $80,000 with respect to A&P (i.e., the settlement amount) and $131,000 with respect to Solyarik. When you add the other unsecured claims listed on his Amended Schedule F aggregating $175,425, Debtor has liquidated and noncontingent debts of $386,425 which exceeds the $336,900 ceiling for unsecured debts.[24] Since he is not eligible to be a Chapter 13 debtor, the Trustee's Motion seeking dismissal is granted.

## C.

For the first time in his memorandum, Debtor asks the Court to give him the "opportunity to convert this case to another Chapter, if he so chooses, before the case is otherwise dismissed." Debtor's Mem. at 4 (emphasis added). Notably, he fails to mention

---

[22] I note that ¶ 27 of the lease attached to A&P's proof of claim defines nonpayment of rent as a "default." Paragraph 3 of the attached guaranty also specifically states that A&P may enforce the provisions of the guaranty "[i]n the event of a default" of the lease.

[23] As noted above, Debtor does not contend that the Solyarik debt is contingent.

[24] Moreover, the application of Hustwaite as he urges will yield no different result. His testimony establishes an admitted liability of at least $90,000 which when added to the other liquidated, noncontingent debts results in a total qualifying debt of $345,425, still over the $336,000 ceiling.

to which chapter he would convert. I will not grant Debtor's informal request. He has been free to convert to Chapter 7 at any time. See 11 U.S.C. § 1307(a). Rather than do so, he has chosen to await the outcome of the Trustee's Motion. The cost of that gamble is dismissal. Moreover, to the extent that Debtor wishes to convert to Chapter 11, § 1307(d) clearly requires notice and a hearing, which Debtor has failed to provide by merely tacking his request at the end of his memorandum.[25] Needless to say, if his intention is to seek relief under Chapter 7, he is free to file a petition under the chapter as no filing bar is being imposed with the dismissal.

An order consistent with the foregoing Memorandum Opinion shall be entered.

*Diane W. Sigmund* (signature)

---
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Dated: February 1, 2008

---

[25] This dismissal is without prejudice. If debtor wishes relief under another chapter, he is not precluded from filing a new bankruptcy petition.

-17-

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| ART STAR, | : | Bankruptcy No. 07-13440DWS |
| aka ARKADY V. BULGAKOU, | : | |
| | : | |
| Debtor. | : | |

# ORDER

**AND NOW**, this 1st day of February 2008, upon consideration of (1) the Chapter 13 Trustee's (the "Trustee") Motion to Dismiss this bankruptcy case (the "Trustee's Motion") and (2) the Motion to Convert Case to Chapter 7 (the "Conversion Motion") filed by Eugene Solyarik ("Solyarik"), after notice and hearing and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby **ORDERED** that:

1. The Trustee's Motion is **GRANTED**, and the Chapter 13 case is hereby **DISMISSED**;

2. The Conversion Motion is **MOOT**.

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge